All done. I don't see you all at a single table, so if you take a minute or two for every handoff, that'll take up about a third of your time. I don't anticipate there will be any rebuttal time, because I'm not going to spend a lot of time getting seven people to decide who would get it if there is any. So with that quick preliminary, I think we have Mr. McGlennon for Appellant Burks. Is that right? Yes. Good morning, Justices of the Court. I'm Michael McGlennon. I'm here for Mr. Burks. His brief asks you to consider three issues he raises. Let me mention three of them briefly. The refusal to consider acceptance of responsibility. It seems that Judge Magnuson found that if you go to trial, you are absolutely not entitled to it. That's the words he uses when he denies my request. What appropriate cases ever granted acceptance to someone who did go to trial? Probably none, but the point is that the guidelines require him to consider it and make a fact-finding to tell me why the guidelines which allow it don't apply. We also raise the enhancement for leadership in your recent case of U.S. v. Earl Meyer, 753rd, 759. You say that giving an instruction even one time makes the guidelines addition not clearly erroneous. I think that disposes of that issue, or at least I'm not going to spend any more time on it. And then we also raise the 404B issue, the introduction of the other crimes evidence concerning Mr. Burks' conviction in Ramsey County for like-kind behavior. I've been rather forceful in my brief, and I won't say more about that. But I will add that if reversed in fairness to Mr. Burks, which I believe you should, then the law of Laughlin would apply. So let me take a moment to... What do you think Judge Magnuson should consider in his acceptance of responsibility? The guidelines suggest that he should consider what we did pre-trial. In the pre-trial, we said it was duplicitous. We made plain from the beginning that we were guilty of fraud on Walmart, did not because these checks were worthless. And because Walmart is not a holder in due course, there's no way under any circumstance by which the bank or the bank's customer could become liable for that check. It was a total fraud, not in the presentation of the check, but a presentation that you had the authority to be there. So we said that from the very beginning, that we are as guilty of sin vis-a-vis Walmart. How close to the very beginning is the very beginning? From the... Having reviewed the discovery and talking with my client, that's the first motion we made for the magistrate judge for him to consider. That's the first thing we did. And we visited with the government and told them that. And then you went to trial. Then we went to trial, and in our opening statement, we said that's why we're here. We said the reach of the federal statute doesn't touch. But you got the instruction that you wanted, didn't you? You got the intent instruction that's... I did. Yeah. I did. And the jury found that he intended to defraud the bank. Yes, they did. So as long as there's sufficient evidence of that, then why should you get acceptance of responsibility? Since the jury found that you did more than, your man did more than defraud Walmart. I didn't see it as the jury did. I saw it as a defense for my client, and I told him let's go to trial because I don't think that under federalism, that the reach of the bank frauds, you know this better than anybody did, Colin. You wrote staples. You know what I'm talking about. I didn't think it reached to a state crime. And the jury, when they hear the judge tell them that the indictment charges a conspiracy for businesses and banks, which is what he said, within that 10 or 15 pages of instruction, he does tell them, frankly, as a trial lawyer of over 40 years, I just think it went by them. Wasn't there evidence that your man was involved in that split deposit scheme? No. None. No evidence. None. Wow. My final issue, of course, is Laughlin. I think if you take the Laughlin now clarity of your staples case and apply it to ours, that would be making you a super jury, an ex post facto violation. And so I think under either, or if you think it should be judged under the now Laughlin clarity of the law, I believe you should order a new trial. That's what I'm looking for. Acceptance of responsibility, at least the two points, is what he, I believe, is entitled to. And those are the things I'd have you consider. So I'll save some time for the rest of the gentlemen here, unless you have more questions. Thank you for your courtesy. Thank you. You're welcome. Mr. Christensen for defendant Maxwell. Good morning, Your Honors. My name is Robert M. Christensen. I represent Mr. Maxwell. I have just two minutes, and so I'll briefly discuss what we're here to talk about and what our appeal is about. And we're asking this court to vacate and remand for resentencing for basically three reasons. Number one, we believe the district court erred in calculating his offense level under the advisory guidelines in two ways. Number one, by overstating his culpability regarding the loss amount and also overstating his culpability with regard to the number of victims that were found at the sentencing hearing. With regard to those two issues, the basic argument is that the loss amount also included the loss amount to a company called Telecheck, which is not a bank. Mr. Maxwell pled guilty to the specific intent crime of defrauding a bank. Telecheck is not a bank. Approximately $500,000 of the loss amount was attributed to Telecheck. And therefore, it should have been subtracted from the loss amount. And that would have equated to a 14-point enhancement for the $400,002 million loss, which would have been two points less under the advisory guidelines. And given his high range on the guidelines, that's a significant decrease. And again- Why isn't that relevant conduct, even if, let's just say, it's effective? Well, I don't think it is relevant conduct because this is a specific intent crime. And- Before Laughlin? I'm sorry? Before Laughlin, or- Well, I just believe that it should not have been counted for the reasons that I'm giving you. This is a specific intent crime to defraud a bank. Telecheck is not a bank. Wasn't there $1.2 million listed, though, on the split deposit scheme? There was. Why isn't that enough? Well, I think if you subtract the amount of loss to Telecheck, it gets you below the million-dollar range. And that's one of the reasons why it should be resentenced. The other issue I want to emphasize is that Telecheck insured many retailers that were defrauded in this scheme. And Telecheck is the only- They were the ones that suffered the actual loss. But nevertheless, the court found that each individual retailer was a victim, but none of those retailers suffered an actual loss. So the bank's loss is insured? That wipes out the bank fraud crime? That's not what I'm saying. What I'm saying is- But Laughlin basically equates the retailer and the bank as the objects. And the fact that the retailers were insured, why is that more relevant than if the bank was? Well, I see it as different because they're not banks. And this was a specific intent crime to defraud a bank, and this is a retailer. So the insurance aspect is not as relevant? No. This is purely who's the victim when you look at the definition of actual loss. And that's the definition. And none of these retailers suffered an actual loss, yet they were counted in the number of victims. And that led to a sixth-level increase. They're not victims. They didn't lose a thing. Telecheck lost money. They should be counted as one victim. And there's a case that's comparable, Izeka. ICAZA. ICAZA, I meant to say. That I think supports our argument along those lines. What about the government's point that there were more than 300 identities used on Laughlin? Is that supported? No, I don't think so. I don't see them as they didn't suffer an actual loss. And so my time is up. I was only allowed two minutes, and so I apologize. I'm going to yield to my colleagues. Thank you. Mr. Izaka. Good morning, if it pleases the court, counsel. Regarding the single versus multiple conspiracy instruction, there was not one overall agreement to perform various functions of the conspiracy. If Mr. Maxwell or Mr. Martin or Royals or Burks, for that matter, hopped on an airplane and flew to Beijing, China, and walked into a McDonald's and gave a check to the clerk, one would not argue that that was foreseeable and that that was not some part of some separate conspiracy. You would not want to hold Mr. Powell responsible for that particular act. Mr. Powell was not involved in burglaries and thefts of retail establishments. He was not involved in buying valid money orders to use the routing numbers later. He was not involved in buying or using blank plastic card stock and a printer to make phony ID cards. He did not use check creation software in this particular case. He was not involved in going into a Walmart or a Sam's Club. The superseding indictment in this case speaks against 13 defendants for conduct between 2006 and 2011. That's six years. It involves retail establishments. Multiple states were entered by various defendants for criminal activity. Thirteen beyond Minnesota, I believe. According to the government's brief, one conspiracy was only involved, involving 33 defendants, two criminal cases that were tried separately, and 16 defendants of which pled guilty. By not giving the multiple conspiracy instruction in this particular case, Mr. Powell was prejudiced. How? By lumping him together with all other transactions and people going about their business, creating criminal activity. And he was unable to argue at the end of the case the multiple conspiracy instruction. So what happened is all the evidence regarding all the transactions alleged by the government spilled over onto Mr. Powell in this case, and therefore he was prejudiced. We ask that his conviction be reversed. With respect to the remaining arguments Mr. Powell made, we rest on the brief. Thank you, Your Honors. Thank you. Mr. Grau for Appellant Hamilton. Good morning. May it please the Court, Your Honors. I wasn't there for the trial but took this over only on appeal. I would like to address this morning the sufficiency of the evidence argument that we made on Mr. Hamilton's behalf. This was an unusual case in that there was really only one witness who testified against Mr. Hamilton at trial. It's clear that the government going in thought that there were going to be two witnesses, Ms. McNeely and Ms. Williamson. As a matter of fact, Ms. Neely had promised that she would do whatever it took because of her delicate family situation to help the government and have their consideration. But then when she testified at trial, given many opportunities to explain how Mr. Hamilton or others might have been involved with basically what happened next sort of questions, she never mentioned Mr. Hamilton. Finally, at the end of her testimony after she gave a very detailed explanation of the fraud that had gone on and who was involved, she was asked the leading question, wasn't Mr. Hamilton there or involved in this somehow? Her answer to that was, I don't remember that. The other witness who testified and is really the only witness who testified against him in this case is Vinicia Williamson, one of the Czech writers like Ms. Neely. She was very much involved in the case, and she described a strange separate crime. I've not seen a case proven this way before, but what happened was she came on and talked about having been connected somehow to Mr. Hamilton's brother Ray for the purpose of a separate enterprise over in Wisconsin where she was going to cash checks with Ray. Her testimony throughout concerning that and also concerning the Czech fraud in this case was very vague. It was very conclusory, and I suggest that it was inherently incredible. What she was trying to do was tell a story that helped the government to some extent but not get into any detail. She was resistant even to the government's direct examination to some extent. In many cases in the transcript you see that there was no response to the government's questions. She told essentially the same story in both cases. She said she went to Wisconsin with Ray. The connection to Mr. Hamilton was he was Mr. Hamilton's brother, and Mr. Hamilton introduced them. Then she carried out the conspiracy over there, and they cashed checks, and they had someone making identification and checks for them, the same as in this one. She made very clear, though, that Mr. Hamilton was never involved. She probably knew that there were cameras in those casinos and that someone could verify whether or not Mr. Hamilton was there. She was very clear that after the introduction, everything she did, she did with Ray. She was somewhat equivocal on whether or not Mr. Hamilton got any money. She first told the government, I believe in direct examination, that he had gotten some of the money, and she related that somehow to the people who made the checks and made the identification. But she was very vague about it, and then on cross-examination she made more clear that to the extent that he got any money from that separate enterprise, that it was out of generosity on her part. She told essentially the same story in this case. She said she met Mr. Powell and the rest of these people and began the enterprise because of an introduction by Mr. Hamilton, but she was careful to say throughout that Mr. Hamilton wasn't really involved in giving her any direction, giving her any checks, giving her any identification, or participating with her. But again, she said that Mr. Hamilton got some of the money, and she expressed some dissatisfaction with the fact that he got money on occasion. I think I've used up more than my share of the time here already, Your Honors, but I would like to just boil it down to some questions that were asked in cross-examination. At the very end of trial counsel's cross-examination he was somewhat frustrated, hadn't really been able to get any specific answers to anything, but at the end he said, and it appears at 1506 of the transcript, my client never went into a bank with you, correct? She agreed, correct. He never went into a Sam's Club or a Walmart with you, correct? Correct. He never told you to fill out a check, correct? Correct. So essentially you're saying that my client split some proceeds with you, is that true? And she said on some occasions. That was the full extent of his involvement, Your Honors. He was charged in four counts. He was acquitted on one of the counts. But it's hard looking at the record, as his trial counsel said, to see why he wasn't classified here as a victim. Ms. Williamson was cashing his checks and he wasn't there. Thank you, Your Honors. Thank you. Mr. Cascorano for Appellant Royals. Good morning, Justices. My name is Craig Cascorano. Pardon me, I represent Mr. Royals. I have two minutes, and maybe I can use less than that. This issue is very simple. Mr. Royals claimed at the sentencing that the enhancement for the amount lost should be 14 points instead of 16. The underlying reason for that was Mr. Royals was incarcerated from July 2007 to September of 2008. And it was our position at the time of sentencing, and it is our position now, that the loss calculation should have been decreased during that period of time. The court denied that, but very specifically stated at the time of sentencing that it would kind of all work out, as far as the sentencing is concerned, because Mr. Royals cooperated and received a downward departure. It's our position that, as I've indicated in my brief kind of offhandedly, the lower you start, the lower you get. Do you have any evidence of withdrawal from the conspiracy other than the fact? No. No. There isn't any affirmative showing, as is reflected in the government's brief, of Mr. Royals withdrawing from the conspiracy. But I think we can conclude, based upon the fact that he was incarcerated, that they also don't have any evidence during that period of time that he participated. I understand the argument of the government saying it was reasonably foreseeable, but I believe that to be a stretch when you're in prison. And I suggest that the enhancement should have been 14 instead of 16, and I think that would have made an ultimate difference with regard to the court's calculation. As I indicated in my brief, if the percentage ratio of downward departure is applied to a 14-level increase as opposed to a 16, I think Mr. Royals' sentence would have been around 78 months. Any other arguments, Your Honor? I would rest on the brief. Thank you very much. Thank you. Mr. Zaid or Helen Allen? Good morning, Your Honors. May it please the Court, I'm R.J. Zaid on behalf of Norman Allen. Two issues I want to raise with the Court. One, the aiding and abetting count 20 needs to be reversed. Why? Because the government has to live by what they asked the jury to do. They asked the jury here, is Allen guilty of aiding and abetting bank fraud? The evidence in this case, and under Staples and under the law of the case, they have to live by that. That's the burden they assumed. And when you measure the sufficiency of the evidence, Your Honors, you have to find, did Allen aid and abet anybody? With respect, when the ECF account was open, and I put together for you the verdict form itself, Your Honor, it says, is Allen guilty of aiding and abetting bank fraud? When you look at that, when the ECF account was open, Allen acted alone. The count involves September 10, 2010. He's the one who wrote the check. He's the one who signed the check. He's the one who endorsed the check. He's the one who went into the bank and deposited the check. And he's the one who walked out from the bank with the money in his pocket. The aiding and abetting instruction requires that somebody else executed a scheme or attempted to execute a scheme or artifice to defraud, that someone else intended to defraud the bank, and that Allen aided and abetted in that. For that reason, that count has to be reversed. There's absolutely no evidence that can support an aiding and abetting. That's what the government asked for. That's what the government should live with. With respect to the conspiracy. Do you have a case where there was a reversal on this ground? In other words, the government told the jury to find, aid, abet, and he acted alone as a principal? Hudson. We cite Hudson in our brief. It doesn't reverse it, Your Honor, but it talks about that aiding and abetting requires that the act be committed by someone and that they aid and abet it. The Eighth Circuit found that that was a proper instruction of the court. I would also submit that Staples applies here as well because the government has to live by what they ask the jury to do. Here they ask the jury to find them guilty of aiding and abetting. And specifically, there was an entire colloquy in which the government specifically requested that aiding, abetting instruction during the trial with the court. At 2110 to 2112, Your Honor, as you look there, the judge looked at the instruction. The judge basically said, with respect to Hamilton, look at count 18 and count 20. They're exactly the same. With respect to Hamilton, the judge says there's no aiding and abetting here. The government specifically went back and said, Judge, we want you to put aiding and abetting there. They have to live by what they ask for the jury. The jury, the final determination for the jury, Your Honor, was did Allen aid and abet Bancroft? That's the question presented to the jury. That was the question that the jury had to decide. It wasn't did he commit Bancroft because if he committed Bancroft, it brings in principal, aiding and abetting, agency. Here, they did not request those. They requested aiding and abetting Bancroft, and it has to be reversed. With respect to the conspiracy, Your Honors, briefly on the conspiracy, there's five grounds for reversal. One, insufficiency of the evidence. Two, there was a variance. Three, jury instruction 22 was a directed verdict of guilt. There was improper joinder, and there was vouching by the case agent in the case. Specifically, the sufficiency of the evidence. The reason this is not the run of the mill sufficiency of the evidence, because the only link, Your Honor, the only link between Allen and the identity theft ring is Vanessa Williamson. The only link between Allen and the criminal activities of Powell is Vanessa Williamson. The only link between Allen and what happened with the ECF account after it was closed was Vanessa Williamson. And her testimony was categorically rejected by this jury. Count 21 accused Allen of aiding and abetting Bancroft. You mean because of the acquittal? Yes, absolutely right, Your Honor, because of the acquittals. She testified that on May 24th, Allen gave her a blank check. Powell filled it out in a fake name. She went into the bank under a fake name and tried to open a bank to defraud the bank. The jury acquitted Allen of that count. The jury also acquitted him of the aggravated theft count, aggravated identity theft count 34. So her testimony was completely discredited. You remove her testimony from here, you remove all links from Allen to the conspiracy charge, and he must be acquitted on that. The final point is jury instruction 22, Your Honor. And on that one, I would ask the court to look at the Pereira-Gabino case, 563-Fed 3, 322 at 327. In that case, the court talks about this same type of instruction in the concealing alien context, where there are multiple particulars. And the court gave a unanimity instruction. In that case, the court gave a unanimity instruction with a precaution that's missing here. In this case, the court, in our case, the court said you need not find that all the theories charged in counts 1, 20, and 21 are proven. Instead, you must find, you must find unanimously beyond reasonable doubt that at least one of the theories is proven. Under Pereira-Gabino, the court reversed. The court reversed, saying it was plain error, because it allowed the jury to mix and match theories with the essential elements charged. Thank you very much for your time, Your Honor. Unless you have something further. Mr. Barenbrinker for Ralph Moore. Good morning, Your Honors. My name is Jim Barenbrinker. I'm here today representing Appellant Gordon Lamar Moore. Appellant raises two issues on his appeal. One, the district court erred by concluding that Appellant Moore lacked standing to challenge the search warrant of an apartment in Invergrove Heights and by failing to suppress the fruits of that illegal search. The second major issue presented in this appeal is that the district court erred by failing to stop the government from changing positions as to whether or not Mr. Moore resided or lived at the searched premises. In this case, Your Honor, there were seven search warrants issued in connection with this case. In its memorandum of law, in opposition to defendants' motion to suppress evidence seized as a result of the search of an apartment, the government stated in their memorandum that they argued that Mr. Moore did not have standing to assert or to object to the search of those premises. Six of the warrants. There were seven. The seventh warrant related strictly to the Invergrove Heights apartment, which is the subject of this appeal. They made no reference. They did not challenge standing. They didn't. In fact, they attached the application for the warrant and the sworn affidavit by the police officer in support of their application for a warrant to their memorandum, and they offered it at the suppression hearing as evidence. The first time that the government took the position that Mr. Moore did not live or did not reside at the apartment in Invergrove Heights and therefore did not have standing or did not have the legitimate expectation of privacy to challenge the warrant and the search of the premises was at the oral argument on the motions. At that time, the defendant relied upon and pointed to the sworn affidavit, the evidence of the government, that in fact asserted under oath by the police officer in making an application for a warrant to search the premises, that in fact this was Mr. Moore's residence. Mr. Moore resided, lived at that apartment. The magistrate judge in his report and recommendation recommended to the district court that the search was illegal, that Mr. Moore in fact did have standing, and that because during cross-examination of the police officer, certain inaccuracies, lies, mischaracterizations, untrue statements rose to the level where under Frank's the search warrant would be invalidated, would be illegal, and all of the fruits of that search would need to be suppressed. The district court did not affirm. In fact, the district court overruled, and the basis for that was that the district court erroneously took the position that Mr. Moore in effect could not point to the government's own evidence that Mr. Moore had standing, or that Mr. Moore had a legitimate expectation of privacy in that apartment. The affidavit that was in the record, that was offered by the government and introduced into evidence, clearly stated that it was Moore's residence, that he lived there. But the district court erroneously stated that Mr. Moore could not rely, could not point to the government's own evidence in the record to establish standing. Was the evidence from the apartment the only evidence that was presented against your client at trial? No. There were several witnesses who testified. All of them, except for one, were convicted felons, multiple convicted felons, who all had worked plea agreements and cooperation agreements with the government to testify against Mr. Moore in exchange for a 5K or downward departure. It all came out very clearly. They were totally incredible, so the only evidence that convicted your client was evidence that came from the apartment? There were dozens and dozens and dozens of pieces of evidence that came from the apartment, yes, Your Honor, that were all linked by these same witnesses as being owned or used by Mr. Moore. That evidence should have been suppressed, and without that evidence, or because that evidence was made available and was put into evidence, it rose to the level that my client did not get a fair trial. His due process rights were violated, and we respectfully ask this court to reverse. Why would it be a due process violation rather than a Fourth Amendment violation? Well, it is a Fourth Amendment violation, Your Honor, as far as the— What's the due process theory? The due process theory, Your Honor, is our other issue arose that the government changed its positions throughout. Oh, all right, on the estoppel point. On the estoppel. That's a due process. Yes, Your Honor. Thank you. Was there a Franks hearing before the magistrate? Yes, there was, Your Honor. And it was at the Franks hearing as part of the second phase of the suppression hearing that the magistrate judge determined, based upon the lies, the misstatements of fact, the untruths in the underlying affidavit, that if you excise those untruths, there would not be sufficient probable cause to provide for a legal search of those premises. And were the agents who executed the warrant, they include the affiant? Yes, as my understanding, the affiant officer, Stephan, I believe, was executed in the search warrant and was there. With that, Your Honor, I see my time is up. Thank you for your attention, and thank you very much. Thank you, Bill. Good job. Thank you. You hit it right on the nose. It shows there is value in experience. Good morning, Your Honors. May it please the court, counsel. My name is Karen Schomer. I'm an assistant United States attorney for the District of Minnesota. In prosecuting this case, the government proved there was a single conspiracy that was entered into by these defendants, as well as approximately 100 other individuals. That conspiracy, while large, was one that was engaged in a common goal, and that is- Let me just start with more. I don't understand how there can be no standing if, rather than that apartment being his residence, it's the place he ran his drug business, which seems to be your, quote, change of position. Why does that deny him standing? Well, first of all, it's the defendant's burden to establish standing. He entered or put in no evidence to show that he had standing, and the Supreme Court has said in Rockus v. Illinois, as well as Rawlings v. Kentucky, that simply showing that you have possession or ownership of an item that's in the residence doesn't necessarily give you standing to challenge the place to be searched. You represented it to me. I'm sorry, Your Honor. Your side represented it in the affidavit. It was in the affidavit that it- The word residence, and maybe that was the wrong word, but even if it was simply the place he did his misdeeds, was there anyone else that had standing? I should say, at the end of the trial evidence, was this issue reopened by the defendant? The issue of whether he had standing? No. Not at the end of the trial, Your Honor. It sounds like the trial evidence would have made it clear that he had standing. No, Your Honor. The trial evidence was such that there were individuals who believed that he lived there, but not necessarily that he did live there. Just because individuals, like, for example, the informant in the first case under the search warrant, it was the informant's belief that the defendant lived there, but in fact the government put on evidence and testimony, as well as documents, to show that the defendant's name wasn't even on the lease. In fact, someone else rented this apartment for the defendant just so that he could use it, and the evidence showed by the government that he, in fact, used it to commit his crime, but not necessarily that he lived there. There was evidence that was recovered from the search warrant that it's... What's the best case for your understanding? That it was the defendant's... The argument you just made. He wasn't on the lease, it's his burden, and so forth. That's correct, Your Honor. What's your best case? The best case is that... What's the best case for your position? Well, first of all, the starting position that it's... Your Honor, don't repeat the position. You have a best case that I should be sure to read. The best case starting off would be Gomez. That shows that it's the defendant's burden. Why can't he meet his burden through the police officer's testimony in the affidavit that he lived there? It wasn't the police officer's testimony. It was actually a statement of an informant that the informant believed that the defendant lived there, and there's a case out of the Ninth Circuit, Zermeno, that says that it's not evidence, that statements in an affidavit are not evidence. In the Zermeno case, those were actually statements in a complaint that the defendant was relying on, and it said that the defendant can't rely on statements in an affidavit as evidence. It's the defendant's burden to go forward and put on evidence of his standing, and it's not just the informant's belief that he lived there. There are a number of factors that the defendant would have to prove or show that he, in fact, had standing, including his access to the apartment. This informant, there was no information that the informant even went into the apartment. He just simply met the defendant at this apartment, and that's where they committed a crime together. But there's no evidence, the defendant put on absolutely no evidence of his standing, that he lived at the residence, that he had access to the residence, that he had the keys to the residence, or that he, in fact, even lived at the residence. Wasn't there a number of witnesses that testified that he lived there? There were a number of. And so they would all fall into the category of just that they believed he lived there, and so there was no evidence that he lived there? That's correct, Your Honor. Those witnesses had been to the apartment, again, to commit crime with the defendant. For example, two of the individuals went there to have their picture taken to create fake IDs. That's Jamie Ingebrigtsen and Jamal Williams. Those individuals believed that it was his apartment, but there was no evidence to suggest that he actually did live there. It was just that the implements of the crime were there. For me, sometime before you sit down, you may better discuss harmless error with regard to this evidence. Your Honor, so, for example, even when I— You may have to do it now, just sometime, whatever you— Well, Your Honor— This would be a good time. If I may, Your Honor, the question was posed, what evidence there was, if this evidence from the apartment had not been admitted at trial? Was there sufficient evidence to convict this defendant? And clearly there were, and Mr. Barenbrinker listed a number of other individuals who testified that the defendant was guilty of the crime, including being involved in this conspiracy. Those include two that I've just mentioned, Jamal Williams and Jamie Ingebrigtsen. Aside from the fact that they had their stolen or the fraudulent identities made at the apartment in Invergrove Heights, they testified independently that they went with Gordon Moore to various financial establishments where Jamie Ingebrigtsen received counterfeit documents, including fake IDs and counterfeit checks, that Gordon Moore had made. Jamal testified that Gordon Moore made them, independent of where he made them. The fact that he made them, gave them to Jamal Williams, and Jamal Williams testified to that fact. Jamie Ingebrigtsen testified to that fact as well. The three of them went together to financial institutions and committed fraudulent transactions. Those are two individuals. We also have Robin Finger, who testified that she's the one that provided victim information from the Department of Psychology to Gordon Moore. She provided victim information such as Social Security numbers, bank routing information. She provided that to Gordon Moore, and then Stephen Maxwell and Russell Royals testified that they received that victim information from Gordon Moore, again having nothing to do with the residents in Invergrove Heights. They received that information from Gordon Moore, and they used it to create counterfeit checks and fake IDs. There was then testimony from individuals like Jackie Cleveland and Mary Jastrzynski, who testified at a different trial that they used that victim information, and Stephen Maxwell testified in Mr. Moore's trial that he passed on that information to Joel Powell so that the fake IDs and counterfeit checks could be used and, in fact, were used to commit fraudulent transactions. And so in addition to that, as I said, Stephen Maxwell testified, Russell Royal testified to their relationship with Gordon Moore, and as a matter of fact, I believe both of those individuals were asked and testified that they had never been to any residence where Gordon Moore lived. What about on this question of estoppel? The defendant's brief quotes the government's closing argument referring to this location as Gordon Moore's house, his residence, and so forth. Why shouldn't we be troubled by the government arguing that in final argument when it defeated his suppression motion on the basis that it was not his residence? There were a number of references in the defendant's brief that talked about  Yeah, I know, but I'm focused on the ones where he says in closing argument the government repeatedly referred to this. In closing, I referred to it as the defendant's residence and then corrected myself and said the Invergrove Heights apartment. There were a number of instances where witnesses testified that it was, in fact, the defendant's residence, but it was not the government's position, nor did it try to prove that the defendant lived there. In fact, the government then put forth in its closing that, in fact, there was a witness who testified that she, in fact, rented it in her own name just so that the defendant could use it, and I referenced that in my closing as well. The government has maintained all along that the defendant certainly used this apartment to commit his crime. The things there were his, but that it was not his residence. The government put on evidence to that effect, and the defendant had no standing, and it's maintained that position all along. From the very beginning, Mr. Barenbrinker mentioned the first time you raised it was at oral argument on the motion, that you didn't raise it all along. It's not in your opposition to the motion? It is, Your Honor. As a matter of fact, at the pretrial motions hearing, the government was asked specifically what the government's position was with respect to standing, and I said, make no mistake, the government's position is that the defendant has no standing with respect to any of the search warrants, including specifically this one. And then Judge Noel asked the government to nevertheless put on its evidence, and that's why the government put on the testimony of Mr. Steffen. So during the trial, the people that testified that this was his residence, the questions were not asked by the government to elicit that testimony. Is that your position? No. For example, Jamal Williams was asked, where did you see a particular piece of evidence? And he said, at his residence. It was not the government asking him whether it was the defendant's actual residence. That's just where Mr. Williams saw the piece of item or the piece of evidence, and he believed it to be his residence. That was a direct example. That's correct. And also on cross, the defendant, one of the references in his own brief was where Mr. Barenbrinker referred to an elicited testimony from one of the witnesses as to this being the defendant's residence. I actually objected to that and was overruled, trying to not elicit testimony that this was the defendant's residence. If the government raised standing for the first time at the hearing as opposed to in its written response to the motion, why shouldn't the magistrate and the district court have allowed the record to be reopened for proof of standing? Because the defendant had the opportunity. The defendant was present and certainly had the ability to put on evidence of his standing right then and there. You mean it's from his own testimony? That's correct, Your Honor, and that certainly has been borne out by case law where the defendant can certainly take the stand, he can testify as to his standing, and the government can't use that against him later on. And so it would have been perfectly acceptable for the defendant to put on evidence of standing then, just as the government put on evidence, contrary to its position that the defendant had no standing, but yet to preserve the record, still put on the evidence of Mr. Steppen in support of the affidavit. There being no other questions, then I would rest on our brief. Thank you, Your Honor. Well, wait, I have a question on another. Yeah. Yeah, well, let me ask you about Maxwell and the number of victims. It seemed to me that your brief really relied on this identity theft theory, that there were 300-plus people whose identity were used. In terms of the number of victims, the challenge to the number of victims? Yeah. Well, clearly there were. I mean, there were a larger portion of the victims in this case were individuals that under Application Note 4 are properly considered victims in this kind of a case. But did Judge Magnuson rely on that theory in finding the 300 victims? I couldn't find a finding about how many people's identities were used. He made – well, there's certainly a reference to it in the pre-sentence report in terms of the number of victims, and it referenced that there were over 300 in finding for the – It says there were over 300 – there were 347 victims in the pre-sentence report, but I didn't see where it broke down who they were. There was – And I didn't see Judge Magnuson saying there were 300-plus identities used. At the trial? No, in the sentencing. No, I apologize, Your Honor, but what I was saying is at trial, there was evidence presented concerning each of the victims and their role in the identity theft. And so Judge Magnuson, in making his rulings, was relying, I believe in part, as was the pre-sentence report writer, in the breakdown of all of the transactions that were entered into by the various defendants. Those were Exhibits, I believe, 205, 206, and 207 at trial, 205 being the one, I believe, referencing the retail fraud transactions. Where can I find a breakdown of how the victims add up to more than 300 and who they are? That would be, for example, in the Exhibits that I just mentioned, the trial Exhibits. 205, which lists all the retailers. No, it doesn't list all the retailers. What it does is, as line items, it lists every transaction, including which victim's information, banking information was used, which victim's driver's license number was used, at which bank and which bank's information was used on each of the transactions, each of the checks that was passed. So it doesn't just list the financial institutions. It also lists individual victims whose information was used. And so when you go through on that being the retail fraud, and then again there was a similar Exhibit that was admitted at trial that concerned the transactions that were conducted at banks. Okay. Well, we'll look at those Exhibits. Yes, Your Honor. You'll see it's very lengthy. The first one concerning the retail transactions, I believe, had over 600 individual transactions. It'll list out the victim's bank account information. So the account number and routing numbers actually belong to a victim, and it's the victim's information that was therefore used. There's also the victim's names, the signatures that were used being the victim's names, also the victim's driver's license numbers are listed on those Exhibits. And they were testified to by Special Agent Kelly Patryka. It was also testified to by Officer Russ Wickland, who were both agents in the case that talked about specific transactions. Officer Wickland went through several of the lines and explained for the jury how to read those different transactions or the Exhibits as a whole. And at the bottom of each of those Exhibits was a total amount of loss for both intended loss as well as actual loss for the total of the transactions. The United States also presented that information again in its sentencing position pleading, and Judge Magnuson ruled ahead of time on many of those arguments before actually having a sentencing hearing. That's two. Do your honors have any other questions? Well, do you want to talk about the sufficiency of evidence on Berks since I think your supplemental brief says, well, under Loughran, we don't have to prove he intended to defraud the bank, but the instructions did require that. That's correct. And so, really, Loughran is of no moment, really, with respect to this appeal. What was the evidence then that Berks specifically intended to defraud a bank or a financial institution? Well, Mr. Berks did, in fact, defraud a bank and a financial institution through the use of the Aaron Carlson identity when he went to U.S. Bank and conducted a fraudulent transaction. That was admitted both through testimony through Exhibit 39, which were records from U.S. Bank, as well as from Exhibit 96B, which was the defendant's conviction in Ramsey County for that very conduct. That was admitted not as 404B evidence. It was part of the charge conspiracy. That's clear evidence of the defendant's intent to fraud a bank. There's also other evidence of the defendant's intent to defraud a bank through the transactions which he was involved with as well at retail establishments like, for example, Walmart. And while he may argue that he didn't intend to defraud a bank when he sent others to go in and commit these transactions, in fact, they engaged in so many different – they provided so much real information and went to such great lengths to ensure that these checks would, in fact, be accepted by not just Walmart but at the banks that was shown from the evidence. For example, the defendants used real driver's license numbers, knowing that Walmart would check those driver's license numbers against their system to see if they'd ever been used in fraudulent transactions. So the defendants, several witnesses testified that, Mr. Burks included, made sure that they had multiple driver's license numbers and, in fact, in some instances conducted more than one transaction in a Walmart using separate individuals' driver's license numbers so that they could, in fact, make sure that the transaction went through Walmart and made it to the bank. On top of that, they made sure not just that there was reference by Kevin Martin that at first they were doing what was called scratch checks where they were actually changing the bank account number on the bottom. But that didn't work with Walmart, and, in fact, a lot of the transactions didn't work. And so the members of the conspiracy learned and, in fact, then obtained real bank account information from real victims so that those transactions actually would go through, again, not just Walmart but to the bank. And so the counterfeit checks that they were creating had real bank account numbers, real routing numbers so that they would go through Walmart and to the bank. And there was also evidence that these transactions, in fact, not all of them, but many of them did hit a bank. A bank was affected, and there were witnesses at trial that testified that, in fact, money was withdrawn from their bank. Not that the government is required to prove that a bank actually suffered a loss, but, in fact, victims did. And these checks did hit the banks. On the Allen aid and abet issue, your brief seems to say that he was charged as a principal, and, therefore, that includes aid and abet. And the argument I heard this morning was, well, that may be true, but he wasn't. The government chose to have the instruction read only aid and abet. How do I bridge that gap? The government's position is that Mr. Allen was charged as a principal. And if you read the language... Are you talking indictment now or the jury instruction? Well, if you look at the indictment, the language is clear that it is him doing the transaction. Now, the language in the instruction was that the defendants, aided and abetted by others, known and unknown, committed the various crimes. It was the defendants. So it didn't say Mr. Allen, aided and abetted by others, or Mr. Maxwell. It was the defendants, aided and abetted by others. And you can see from the plain language of the charging document which way each of the defendants was charged. For example, there are individuals who are charged clearly as aiding and abetting because the language says that Defendant Powell caused the deposit of such-and-such transaction or such-and-such check. He caused the deposit of a check by Venetia Williamson into her account. But with respect to Count 20, Mr. Allen's conduct is clearly charged that he deposited a fraudulent check into his Even Cash Flow account. Was there a specific jury instruction on Count 20? No, there were jury instructions as to bank fraud in particular, and Count 20 was one of them. So there was not a specific instruction as to each individual's substantive account of bank fraud. Now, the question then becomes, could he also be convicted as an aider and abetter? Yes, he could. The government also put on evidence that he was working with someone else, namely Joel Powell. And there's evidence that, and this goes to Mr. Allen's challenge to the fact of whether he was involved in a conspiracy to begin with. And, in fact, there's evidence that Mr. Allen was, in fact, working with Joel Powell and others to be involved in this conspiracy. Joel Powell was on the Secretary of State records that were used to open one of the Even Cash Flow accounts, that is, the central bank account. Joel Powell was present, and Tom Delaney with Central Bank testified that he was present and actually tried to be a co-signer on that account. Tom Delaney, suspecting that there was some mischief going on, did not allow Joel Powell to actually be a signer on the account. Nevertheless, he was there and attempted to be a signer on the account. The jury was entitled to infer that the ECF, the Even Cash Flow accounts, were open for purely fraudulent reasons. One of the ways that they can infer that is because the Even Cash Flow accounts never had any real transactions. They never had any legitimate transactions conducted on these accounts. Every transaction that was conducted on any of the three Even Cash Flow accounts were all fraudulent. There was testimony about that, as well as evidence in the form of documents that was submitted to the jury concerning that. On top of that, there was testimony from Diane Carnitz that she spoke with Defendant Allen, who told her that he was involved in the real estate business. In fact, on the documents that were submitted to Central Bank, the defendant actually stated that the business was for health reasons. And so the jury was entitled to infer from all of this that the defendant, Allen, was involved in fraud when he opened these accounts. These accounts were for no other legitimate purpose but to commit fraud, and that he was engaged in this fraud with Joel Powell and others. There were also phone calls between Norman Allen and Joel Powell right around before, during, after all of the fraudulent transactions, and that evidence was also submitted at trial. Are there no other questions, then?  Thank you, Your Honor. Thank you, Counsel. The case is very efficiently presented, and that wasn't easy. And it's been thoroughly briefed, and we've got a lot of work to do to digest it all, which is in the process. So we will take the cases under advisement.